[Civ. No. 41990. First Dist.. Div. One. Mar. 28. 1979.]

WILLIAM J. MAYES, Plaintiff, Cross-defendant and Respondent, v. STURDY NORTHERN SALES, INC., et al., Defendants, Cross-complainants and Appellants.

**COUNSEL**

Philip J. Scott and Harry W. Brainard for Defendants, Cross-complainants and Appellants.

Lounibos & Lounibos and Leroy J. Lounibos, Jr., for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**DEAL, J.\***—Sturdy Northern Sales, Inc., Sturdy Dog Foods, Inc., Richard E. Walther, and Randy Walther appeal from a judgment in the net amount of $98,751, together with costs, in favor of respondent William J. Mayes.

On January 29, 1975, Mayes filed a complaint for damages against appellants; he alleged breach of a franchise agreement and conspiracy to destroy his business. Defendants answered with a general denial except for Sturdy Northern Sales, Inc.'s admission that it entered into the agreement and was bound thereby. Sturdy Northern filed a cross-complaint alleging that Mayes had breached the agreement; the cross-complaint was dropped at trial. The case was tried before the court which filed its memorandum decision on February 14, 1977, in favor of Mayes.

---

\*Assigned by the Chairperson of the Judicial Council.

Without considering objections to proposed findings of fact and conclusions of law filed by defendants, the court signed and filed the proposed findings and conclusions and the judgment which was entered on March 10, 1977. Defendants' motion to set aside and vacate the judgment was granted. The court made minor changes in the findings and signed a similar judgment which was entered on May 3, 1977. A motion for new trial was denied.

Defendants' notice of appeal was filed March 25, 1977, from the March 10th judgment. Since the judgment was set aside on defendants' motion, they have appealed from a nonexistent judgment. Nevertheless, we can construe their notice as referring to the appealable judgment of May 3d. California Rules of Court, rule 2(c) provides: "A notice of appeal filed prior to rendition of the judgment, but after the judge has announced his [or her] intended ruling, may, in the discretion of the reviewing court for good cause, be treated as filed immediately after entry of the judgment." Both parties have treated this appeal as properly filed. Therefore, no prejudice has resulted from the faulty procedure. "Good cause" for accepting the appeal will be presumed in the absence of a showing of prejudice. (*Windsor Mills* v. *Richard B. Smith, Inc.* (1969) 272 Cal.App.2d 336, 339 [77 Cal.Rptr. 300].)

### STATEMENT OF FACTS

Respondent Mayes started working in 1963 for Sturdy Northern Sales, Inc. (hereafter Sturdy Northern) as a driver and salesman for dog food manufactured by Sturdy Dog Foods, Inc. (hereafter Sturdy Foods) at its San Leandro plant. On September 15, 1967, Mayes, Sturdy Northern, and Craig Sandford (then owner of Sturdy Northern and Sturdy Foods) entered into a franchise agreement. The agreement which grants Mayes an exclusive franchise to "sell, handle and deal in Sturdy Dog Food products" within a specified Northern California area, was requested by Mayes, but prepared by the attorney for Sturdy Northern. Mayes' attorney reviewed the agreement, but the following paragraphs in dispute were not altered:

"4. *Supply of Merchandise*: The party of the second part [Sturdy Northern] shall provide all necessary merchandise to the party of the first part [Mayes] who shall with due diligence make sales of the product. The party of the first part shall purchase only Sturdy Dog Food products and shall purchase all his necessary merchandise from the party of the second part who shall reasonably provide the same. . . ."

"6. *Chain Stores*: It is understood that status quo shall remain the same on Lucky and Safeway who are now being serviced as headquarters accounts."

In December 1971, Sturdy Northern and Sturdy Foods were purchased by Richard and Randy Walther (father and son). Richard Walther's father also purchased a third interest, but he was apparently not active in the business. Both Sturdy Northern and Sturdy Foods are California corporations having offices located at the Sturdy Foods plant in Burbank, California. Sturdy Northern operated a dog food manufacturing plant in San Leandro, California. Richard was president of both corporations and operated out of Burbank. Randy was vice-president of both corporations and ran the San Leandro plant. Mayes was one of three Northern California distributors who obtained their supplies from the San Leandro plant, which also had limited accounts with distributors in Oregon and Washington and with Lucky Stores, Safeway and United Grocers. On April 26, 1972, Mayes exercised his option to renew the franchise agreement until September 15, 1977, and the exercise was acknowledged by Richard.

Under the Walthers' ownership, Mayes or his employee came to the plant in San Leandro two days a week to pick up the food that he had ordered. Between pickup and delivery, he stored the food in a rented warehouse in Santa Rosa. Mayes steadily increased the amount of food he was distributing, from roughly 40,000 pounds a month in 1963 to 120,000 pounds in 1973, an average increase of about 20 percent a year.

When the Walthers bought Sturdy Northern, Mayes had been receiving a 2 percent discount if he paid his bill within 10 days. Around August 1974 Mayes was informed verbally that the discount would be discontinued. Mayes' attorney sent a letter to Sturdy Northern requesting confirmation of the policy change. The reply from Richard was ungracious and uninformative: "I will certainly give you and your client my immediate attention to the matters referred to in your letter dated September 10th, 1974, as well as a few other unmentioned, relevant issues as follows: One, you've just sent your letter to the right place. Two, you've just aborted our good-faith efforts at whatever short-lived business relationship that may have existed. Three, you've just raised issues on which you may take whatever action you deem appropriate under the circumstances." Mayes continued to take the discount until October 29, 1974, when he received written notice of its termination.

The letter from Mayes' attorney had also inquired about the shortages that Mayes began to experience in June 1974. The evidence reveals that Mayes was shorted on his orders for each month from June 1974 through January 1975, except for August 1974, when he received his full order. Mayes met with Richard Walther in July to discuss the problems. The testimony about the conference is in conflict. Richard testified that Mayes had refused to take some of the oversupply which had been created by overproduction and by the termination of the Washington and Oregon accounts. He was "real disappointed" and believed that Mayes showed thereby that he was not "on the team." Mayes testified that he had told Richard that the shortages made it impossible for him to place larger orders. At a later time when he asked for more he was told that the amount given was "all you can have." By November, Mayes was receiving only 61 percent of his order. In January 1975 Mayes decided to stop distributing because he "couldn't get any food." His trucks, which could carry 16,000 pounds each, were given only 2,000 pounds on each of two trips in early January, and "when you get 4,000 pounds in two truckloads, I am out of business." Before he gave up the business, he had discontinued some customers because of the shortages.

Randy Walther testified that part of the reason for the shorting was the dispute over the discount. He had refused some deliveries to Mayes because he wasn't certain that a check for $10,000 from Mayes had actually reached Burbank. Another factor was Randy's belief that Mayes had failed in the past to pick up available supplies. This belief was based in part on the July conversation between Richard and Mayes mentioned above. Mayes' hiring of a lawyer was also a sore point. Other reasons for the shortages were increased distribution in Southern California and breakdowns in the Burbank plant and increased demand from the house accounts.

For about six years prior to November 15, 1974, Mayes had supplied six Safeway stores in his area with eight-pound quick kibble, twenty- and fifty-pound regular and quick kibble, and four-pound regular and quick. Sturdy Northern had serviced an unspecified number of Safeway stores as a house account (i.e., direct deliveries from the San Leandro plant) for the eight-pound sacks of regular kibble. Carl Roepke, a food broker who had been associated with Sturdy Northern for about 18 years, testified that Safeway had tolerated the "store-door" deliveries from Mayes, but had expressed a strong preference for all deliveries to a central warehouse for distribution to individual Safeway stores. Randy and Richard discussed the franchise agreement provision relating to house accounts

and determined that they were not limited in what and how they could sell to Safeway. Randy mentioned to Mayes in August that Sturdy Northern would be selling to Safeway. A pilot project for 60 Safeway stores was commenced through Roepke in November and in January 1975 had extended to the 220 Northern California stores. On November 15, 1974, Safeway notified Mayes that it would accept no more deliveries from him. At about this time, the price of the product was raised to the distributors, but not to Safeway or Sturdy Foods in Burbank who also continued to receive the discount that the distributors no longer enjoyed. When the Walthers agreed to the change of policy with Safeway, they were aware that it would hurt Mayes' business.

By Randy's testimony, food was usually available during the months in question. Sturdy Northern had installed a new oven in the San Leandro plant and had achieved a 30 percent increase in production by November 1974. This improvement was the result of the distributors' representations in 1971 that they could sell more product if they had it. The increase, however, was not given to Mayes or Powers, another distributor. It went rather to Burbank and to the house accounts, with whom Sturdy Northern did not have contracts. Randy testified that he regularly communicated with Richard who established guidelines for distribution during any shortage periods. Burbank and the house accounts came first; the distributors received an amount proportionate to what each had received in the past. The evidence showed that except for June and July production was significantly higher than it had been the previous year.

### Breach of Contract and Conspiracy to Induce Breach of Contract

The trial court gave judgment against all defendants, two of whom are corporations and two of whom are individuals. The individual defendants contend that they should not be responsible for damages since (1) they are not parties to the franchise agreement, and (2) no tort has been pleaded or proved against them. Respondent counters that they are rightly charged with tort liability as "civil conspirators."

The individual defendants, Richard and Randy Walther, are not liable for breach of contract.[1] (*Donahue* v. *Ziv Television Programs, Inc.*

---

[1] Although appellants do not raise any issues relating to the judgment against Sturdy Foods, it is clear that the corporation's sole liability would be for conspiring with Sturdy Northern and the individual defendants to induce Sturdy Northern to breach the franchise agreement. The court found that Sturdy Foods had conspired with Sturdy Northern, et al., to force respondent out of business by means of contract breaches.

(1966) 245 Cal.App.2d 593, 607 [54 Cal.Rptr. 130], where the court, limited by a complaint alleging express or implied contract only, suggested that the plaintiff might have proceeded on a theory of breach of confidential relationship or of inducing breach of contract.) Respondent Mayes, Craig Sandford, and Sturdy Northern were the parties to the franchise agreement. When Sandford sold Sturdy Northern, the corporation's contracts remained in force, but the Walthers did not assume Sandford's personal contractual liability in the absence of an assignment and delegation (and the record reflects no such assumption of rights and duties). Sandford remained liable for breach of the franchise agreement. (Civ. Code, § 1457.) Respondent could have sued him, but chose instead to sue the Walthers, two people who are not parties to the contract.

Our court analyzed the cause of action for civil conspiracy in *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64-65 [35 Cal.Rptr. 652] (sub. opn. (1970) 1 Cal.3d 600 [83 Cal.Rptr. 202, 463 P.2d 426]), and summarized: "The gist of an action charging civil conspiracy is not the conspiracy but the damages suffered. . . . [A] conspiracy, in and of itself, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage. . . . '[T]he major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.' . . . [¶] To state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.] [¶] A tort action 'will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification.' [Citation.] A tort action will also lie against third persons who pursuant to a conspiracy have wrongfully induced or procured the breach of a contract resulting in damages. [Citations.]"

In *Wise,* the court held that an action for conspiracy will lie against a party to the contract as one of the defendant conspirators, but "[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage. . . . [O]rdinarily corporate agents and employees acting for and on behalf of the corporation cannot be held liable for inducing a breach of

the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged. The inducement of the breach to be actionable must be both wrongful and unprivileged." (223 Cal.App.2d at pp. 72-73.) In *Wise,* the complaint alleged that the individual defendants "were 'employees, agents and representatives' of their respective corporations and 'were acting within the course and scope of their said employment. . . .' There is no allegation that they were acting in any other capacity . . . [or] for their individual advantage." (*Id.,* at p. 73.) *Wise* and most of the cases involving an action for conspiracy to induce breach of contract have reached the appellate court on a judgment of dismissal entered after the sustaining of a demurrer without leave to amend.

In the present case, the complaint alleges that Richard and Randy were "agents, employees, officers, and owners" of Sturdy Northern. Nowhere did it allege that they were acting within the scope of their employment. We will consider the privilege of officers and owners later.

■ The elements of a cause of action for inducing breach of contract "are (1) that a valid contract existed between the plaintiff and another party; (2) that the defendant had knowledge of the contract and intended to induce a breach thereof; (3) that the contract was breached, (4) as a proximate result of the defendant's wrongful or unjustified [unprivileged] conduct, (5) resulting in damage to the plaintiff. [Citations.]" (*Abrams & Fox, Inc.* v. *Briney* (1974) 39 Cal.App.3d 604, 608 [114 Cal.Rptr. 328]; see 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 630, p. 2259, and cases cited therein.)

■ Officers are liable for their tortious acts committed on behalf of the corporation whether or not the corporation is also liable. (See *Golden* v. *Anderson* (1967) 256 Cal.App.2d 714, 720 [64 Cal.Rptr. 404]; *Price* v. *Hibbs* (1964) 225 Cal.App.2d 209, 222 [37 Cal.Rptr. 270]; *O'Connell* v. *Union Drilling etc. Co.* (1932) 121 Cal.App. 302, 308 [8 P.2d 867] [overruled on other grounds in *Mary Pickford Co.* v. *Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 522 (86 P.2d 102)]; cf. Civ. Code, § 2343 (agents).) If their conduct is privileged (or justified), however, tort liability will not be imposed. (See Rest.2d Torts (1977) §§ 766-774A.) The privilege of one who has a financial interest in the business of another was discussed in *Culcal Stylco, Inc.* v. *Vornado, Inc.* (1972) 26 Cal.App.3d 879, 882-883 [103 Cal.Rptr. 419], and the court stated: "[T]he defendants, being the principal owners of a business, without more, did not make their intentional interference with a contract of the business privileged as a

matter of law—that is, privileged 'under all conceivable circumstances.' The privilege that arises by reason of section 769 [of the Restatement] is at most a qualified one dependent for its existence upon the circumstances of the case. It is essentially a state-of-mind privilege and therefore its existence cannot normally be satisfactorily determined on the basis of pleadings alone. [Citation.] The resolution of the issue turns on the defendants' predominant purpose in inducing the breach of contract. (See Prosser, Torts (4th ed. 1971) § 129, p. 943.) This is preferably a matter to be determined on the basis of proof rather than of pleading."

Privilege is an affirmative defense that must be pleaded and proved. (See *A. F. Arnold & Co.* v. *Pacific ·Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 714-715 [104 Cal.Rptr. 96].)

We have examined the record in the case before us to determine whether tort liability has been properly pleaded and proved and whether the evidence and findings support the judgment against the individual defendants (and Sturdy Foods). Although not a model of pleading for an action for conspiracy to induce breach of contract, the complaint does contain the essential allegations as outlined above;[2] the prayer requests both tort and contract relief. Appellants urge that Mayes did not plead, nor did the court find, that appellants had *induced* breach of contract and since that essential element is missing, tort liability cannot be imposed. Black's Law Dictionary (rev. 4th ed. 1968) page 915, defines "Induce" as "To bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on."

---

[2]The first cause of action alleged breach of contract against the four defendants. The second cause of action incorporated the first cause of action and further alleged, in part:

"V. During the course of the performance of said franchise agreement, and at all times herein mentioned, defendants had the responsibility and duty, and had agreed with plaintiff, to provide plaintiff with all necessary merchandise and to maintain the status quo with regards to Lucky and Safeway Stores serviced by defendants in plaintiff's franchise territory;

"VI. During the year 1974, defendants, and each of them, wilfully, knowingly, and maliciously conspired and agreed among themselves to destroy plaintiff's business and financial credit by cutting back his supply of merchandise in excess of what other distributors and customers of defendants were cut back and by increasing its distribution of merchandise to the Safeway Stores in plaintiff's franchise territory;

"VII. [Value of plaintiff's business before wrongful acts.]

"VIII. As a proximate result of defendants' wrongful acts pursuant to the conspiracy herein alleged . . . [loss of business];

"IX. [Loss of profits];

"X. [Physical injury and emotional distress of plaintiff];

"XI. Defendants, and each of them, did the things herein alleged oppressively and maliciously, and plaintiff is entitled to punitive and exemplary damages in the sum of $500,000.00; . . ."

It is clear that the complaint alleged and the findings contained a sufficient substitute for the word "induce."

Defendants did not demur for misjoinder of the parties to the contract action; nor did they demur on the ground that the complaint failed to state a cause of action for breach of contract against the individual defendants. The affirmative defense of privilege was not asserted and therefore is deemed waived. (See Code Civ. Proc., § 431.20; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 926, pp. 2510-2511.) Nevertheless, evidence relating to the issue of privilege was admitted and considered by the court which found that the parties to the conspiracy "continuously refused, *without just cause,* to provide" Mayes with merchandise. (Italics added.) The record also reveals that the court refused appellants' request to delete from the findings the words "unlawful" and "maliciously" wherever they appear and to add a finding that "at all times relevant hereto, both [Randy and Richard] were acting within the course and scope of said capacities and employment [as vice-president and president]. . . ."

During the trial, the court and counsel treated the breach of contract action and the second cause of action for conspiracy as one and the same. The evidence was consistent with both contract and tort theories, and there was substantial evidence to support the judgment for conspiracy to induce breach of contract. The trial court filed a "decision" setting out with precision the basis for its intended judgment. After hearing objections, it filed its amended findings[3] and conclusions and judgment.

---

[3]The pertinent findings of fact are:

"6. On April 26, 1972, William J. Mayes exercised his option to renew [the franchise agreement] under paragraph 3 of said agreement.

"7. On May 3, 1972, Richard E. Walther, president of Sturdy Northern Sales, Inc., acknowledged said renewal.

"8. Said agreement was thereby continued in full force and effect until September 15, 1977.

"9. William J. Mayes performed all conditions, covenants, and promises under said agreement, on his part to be performed.

"10. In 1974, Sturdy Northern Sales, Inc., Sturdy Dog Foods, Inc., Richard E. Walther, and Randy Walther, entered into an unlawful agreement to force William J. Mayes to give up his exclusive franchise. In furtherance of this unlawful agreement, the parties thereto continuously refused, without just cause, to provide William J. Mayes will [*sic*] all necessary merchandise as specified in paragraph 4 of the Exclusive Franchise Agreement. This course of conduct commenced in June 1974, and continued every month thereafter (except August 1974) until January 10, 1975. This course of conduct caused William J. Mayes to lose sales and to suffer a decrease in earnings and was in violation of paragraph 4 of the Exclusive Franchise Agreement. Plaintiff [William J. Mayes] discontinued performance under the [terms of the Exclusive Agreement] on or about January 10, 1975.

(See Cal. Rules of Court, rule 232; Code Civ. Proc., § 632.) Appellants' motion for a new trial was denied; it was made on the grounds "that the conclusions of law filed by the Court herein are incorrect or erroneous in that they are not supported by or consistent with proposed objections and counterfindings . . . and that said errors materially affect the substantial rights of Defendants." They did not specify objections to the theory on which the court based its judgment.

On appeal, the Walthers contend for the first time that the action is based solely on breach of contract and therefore liability, if any, can only be imposed on Sturdy Northern, a party to the franchise agreement. They point to the conclusions of law which specifically provide that Mayes is not entitled to punitive damages or to damages for mental suffering or emotional distress, and they infer that the court rejected tort liability as the basis for its judgment. They bolster their position with the memorandum of decision in which the court stated: " 'Civil Code Section 3294 providing for punitive damages, refers to breach of an obligation "not arising from contract," except where [the] wrongful act is also a tort.' [Citation.] [¶] Plaintiff is not entitled to an award of punitive damages." They add that the court awarded an offset against general damages which is consistent with contract theory only.

If there is any clear and sufficient finding on which a judgment may rest, it will be presumed in favor of the judgment that the court did rely on it, and inconsistencies or insufficiency of other findings will be disregarded. (*Brewer* v. *Simpson* (1960) 53 Cal.2d 567, 583-584 [2 Cal.Rptr. 609, 349 P.2d 289]; see 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 235, p. 4226.) Although not precisely stated in "tort language," the court below set forth in its findings each of the facts essential to impose liability for inducing breach of contract. Finding No. 15 allowing an offset relates to the measure of damages, not to the action

"11. After November 15, 1974, Sturdy Northern Sales, Inc., increased its distribution and sales to Safeway Stores in the exclusive franchise area of William J. Mayes. . . . This course of conduct caused William J. Mayes to lose sales and to suffer a decrease in earnings and was in violation of paragraph 6 of the Exclusive Franchise Agreement.

"12. Said unlawful agreement among [the four defendants] was carried out wilfully, knowingly and maliciously by the parties thereto in order to force William J. Mayes to give up his exclusive franchise.

"13. As a proximate result of the wrongful acts of [the four defendants], William J. Mayes was forced to give up his exclusive franchise in January 1975.

"14. As a proximate result of said wrongful acts, William J. Mayes has suffered general damages from loss of profits in the amount of $99,751.00.

"15. Defendants are entitled to an offset in the amount of $1,000.00 for monies earned by William J. Mayes in 1975."

itself. To the extent that it is inconsistent with tort liability, it may be disregarded.

■ "[T]he conclusions of law are a relatively useless appendage. The important conclusion of law is the *judgment*. If the findings support the judgment it will be affirmed, regardless of whether the findings support the conclusions, or whether the conclusions of law are consistent or properly stated, or even if the conclusions are omitted entirely. [Citations.]" (*Estate of Grimble* (1974) 42 Cal.App.3d 741, 750 [117 Cal.Rptr. 125], quoting from 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 304, p. 3113.)

The conclusions indicated that the trial court had used contract theory: Sturdy Northern, Richard and Randy "were bound" by the terms of the franchise agreement, and their failure to comply with paragraphs 4 and 6 constituted a breach of the agreement; Mayes was not entitled to punitive damages or to damages for emotional distress or mental suffering; a $1,000 offset was allowed. Other conclusions, however, provided that the four defendants "did wilfully, knowingly, and maliciously conspire and agree among themselves to force William J. Mayes to give up his exclusive franchise" and as a result of the conspiracy and breaches, Mayes is entitled to damages for loss of profits in the amount of $99,751. Since the findings sustain the judgment, the inconsistent conclusions will be disregarded.

■ Although an oral or written opinion of the trial judge may be used on appeal to interpret ambiguous or uncertain provisions in the judgment (*Macmillan Petroleum Corp.* v. *Griffin* (1953) 116 Cal.App.2d 425, 427 [255 P.2d 75]), it is not the judgment and cannot be used to challenge otherwise sufficient findings of the court. (*DeCou* v. *Howell* (1923) 190 Cal. 741, 751 [214 P. 444].) As in the conclusions, the trial court's language of "conspiracy" carried out "wilfully, knowingly, and maliciously" argues that tort liability was found. The court's explanation for refusing punitive damages for such oppressive conduct, however, could arguably indicate that it found only contract liability. It could also indicate a belief that punitive damages are inappropriate or unauthorized when a breach of contract is the basis for tort liability. Such a belief would have been inaccurate. (See *Weisenberg* v. *Molina* (1976) 58 Cal.App.3d 478, 490 [129 Cal.Rptr. 813]; *Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 244-245 [102 Cal.Rptr. 547] [disapproved on other grounds in *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 580, fn. 10 (108 Cal.Rptr. 480, 510 P.2d 1032)].)

■ The underlying issue is whether the appellants can attack the judgment because of ambiguities about the theory upon which the court based its decision. It is well established that if a trial court's decision is "right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) The factual issues presented below were the same for either theory of recovery, and appellants were given ample opportunity to present their version of the business transactions among the parties. (Cf. *Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534].) Any error resulting from the trial court's application of contract theory worked to appellants' advantage. It saved them from an award of punitive damages.

## INTERPRETATION OF THE CONTRACT

■ The franchise agreement provided in part: "6. *Chain Stores.* It is understood that status quo shall remain the same on Lucky and Safeway who are now being serviced as headquarters accounts." As detailed in the statement of facts, *ante,* Safeway dealt directly with headquarters for eight-pound bags of one type of kibble. Respondent supplied the balance of their inventory. Appellants contend that there was no ambiguity in the contract and that they were entitled to service the Safeway account.

The trial court said in its decision: "Even though paragraph 6 stated that 'Lucky and Safeway are now being serviced as headquarter accounts,' it is obvious that the parties treated that language as meaning that the two stores were 'headquarter accounts' only insofar as the delivery of 8 lb. bags were [*sic*] concerned. The parties to the contract operated on the assumption that plaintiff had the exclusive right to service Lucky and Safeway stores in his area with 4, 20 and 50 lb. bags. That arrangement remained in effect after the defendants Walther became the owners of the two defendant corporations [1971] and continued until November of 1974. [¶] It is the Court's conclusion that paragraph 6 must be interpreted in the same fashion the parties themselves interpreted it, that is, that plaintiff had the exclusive right to service Lucky and Safeway Stores with 4, 20 and 50 lb. bags throughout the term of the agreement, as renewed."

This interpretation is clearly correct. That's what the language means and that's how the parties acted. The Walthers' testimony that they

understood the language to mean that Safeway was a house account only is not persuasive. Appellants' own authority, *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13], states that "the undisclosed intentions of the parties are, in the absence of mistake, fraud, etc., immaterial; and that the outward manifestation or expression of assent is controlling." Until November 1974, appellants' actions expressed their intention that Mayes was to service Safeway with all quantities except eight-pound bags of a certain kind of dog food.

This conclusion is supported by relevant statutory law. Civil Code section 1641 provides that: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." This means that "headquarters accounts" must be given effect, but so must "status quo." "Status quo" means "the existing state of affairs." (Webster's Seventh New Collegiate Dict. (1972) p. 856.)

Civil Code section 1654 provides that, when there is any uncertainty, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." The clause in question was drafted by Sturdy Northern. No uncertainty existed until the Walthers unilaterally decided that the clause gave them the exclusive right to service Safeway with all quantities of all types of dog food. The language should be interpreted against Sturdy Northern, as the court below did.

### DAMAGES

The trial court concluded that Mayes had sustained $99,751 in damages from loss of net profits. Appellants contend that the damages were improperly measured, that the evidence did not support the award of damages, that Mayes failed to mitigate damages and that the damages were not foreseeable at the inception of the franchise agreement. They cite Civil Code section 3301 which provides: "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."

■ An award based on loss of net profits is proper for breach of contract. (See *Morello* v. *Growers Grape Prod. Assn.* (1947) 82 Cal.App.2d 365, 375 [186 P.2d 463].) Such a measure of damages is equally appropriate in a tort action for conspiracy to induce breach of contract.

The amount of damages was proved by the testimony of Patrick Doyle who had been the accountant for Mayes throughout his association with Sturdy Northern. Mayes had recorded his sales tags, receipts and checks from which Doyle entered the figures in a general ledger and made out tax reports, etc. Doyle made an historical study of the annual growth of Mayes' business, the shortages, and projected loss of income through the end of the franchise term. He used information supplied by Sturdy Foods and Sturdy Northern, as well as data from Mayes. With the exception of the recession year of 1974, Mayes' business had grown in total sales between 10 and 25 percent each year. These figures averaged 16.98 percent after allowing for a 3 percent annual inflation rate. Doyle separately calculated the actual and projected growth of sales to Safeway and computed the adjusted average annual increase in sales at 20.04 percent which would have produced a net profit of $13,997 over the remaining term of the agreement. Doyle used a conservative estimate of sales, allowing for no increase of annual sales (instead of continuing the historic 16.98 to 19.98 percent increase each year). Using the same method, he arrived at a loss of net profit from non-Safeway sales in the amount of $85,754 which, added to $13,997 for Safeway, totals $99,751. Doyle did not allow for inflation which would have increased the damage figures. Appellants did not object to the testimony or documents reflecting these calculations, although they raised some questions about how and when the tags were kept by Mayes. They offered no contradictory evidence.

Appellants further contend that the calculations were based on the "incredible assumption" that Mayes "always sold what he ordered." Doyle's historical analysis was based on actual sales (not orders), however, and no disparity between sales and orders is implied or evident from the record. Appellants also urge that even though Mayes' sales might have increased, no adjustment was made for an increase in his expenses. This argument has no merit. The projections kept the sales at the last historical level and did not assume an increase in sales.

Appellants urge that Mayes failed to mitigate his damages. He earned about $1,000 in 1975 and received about $4,000 in interest income. He made one unsuccessful attempt to locate work in 1975. He was 59 years of age at the time, and it was not his intention to retire by breaking the franchise agreement. ■ A plaintiff cannot recover damages that would have been avoidable by his or her ordinary care and reasonable exertions. (*Henrici* v. *South Feather Land etc. Co.* (1918) 177 Cal. 442 [170 P. 1135].) Increased loss due to the plaintiff's willfulness or negligence is

the plaintiff's own burden. (*Ibid.*) Failure to mitigate damages, however, is a matter of affirmative defense that must be pleaded and proved by appellants. (*Baruh* v. *Kuhl* (1963) 213 Cal.App.2d 266, 273 [28 Cal.Rptr. 573].) They did not plead failure to mitigate, and they presented no evidence of employment opportunities for a man of Mayes' age and skills.

Appellants' final contention is that the parties did not contemplate at the time of formation of the contract that breaches would cause Mayes to terminate his business and that such damages were unforeseeable. It seems reasonable to foresee that a supplier's significant cutback of supplies might force the distributor to give up his franchise. The court found that Mayes did not voluntarily give up his business and that the damages were the proximate result of the breaches. These factual findings are supported by substantial evidence.

The judgment is affirmed.

Elkington, Acting P. J., and Newsom, J., concurred.