[L.A. No. 31588. Aug. 30, 1984.]

SEAMAN'S DIRECT BUYING SERVICE, INC.,
Plaintiff and Appellant, v.
STANDARD OIL COMPANY OF CALIFORNIA,
Defendant and Appellant.

## COUNSEL

Janssen, Malloy & Marchi, Clayton R. Janssen, Lascher & Lascher, Lascher & Wilner and Edward L. Lascher for Plaintiff and Appellant.

Wylie A. Aitken, Glen T. Bashore, Richard D. Bridgman, Edwin Train Caldwell, Robert E. Cartwright, Victoria De Goff, Sanford Gage, John Gardenal, G. Dana Hobart, Harvey R. Levine, Edward I. Pollock, Arne Werchick, Stephen I. Zetterberg and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Noble K. Gregory, Anthony P. Brown, William S. Mailliard, Jr., C. Douglas Floyd, Mark H. Penskar and Walter R. Allan for Defendant and Appellant.

Horvitz & Greines, Ellis J. Horvitz and Gideon Kanner as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**THE COURT.**\*—This case, which arises out of a complex factual setting, presents three issues for decision. (1) Was the letter agreement signed by Seaman's Direct Buying Service, Inc. and Standard Oil of California, Inc. sufficient to satisfy the statute of frauds? (2) Is "intent" an element of a cause of action for intentional interference with contractual relations? (3) May a plaintiff recover in tort for breach of an implied covenant of good faith and fair dealing in a noninsurance, commercial contract?

---

\*Before Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J.

I.

Plaintiff, Seaman's Direct Buying Service, Inc. (Seaman's), is a close corporation composed of three shareholders. During the late 1960's and early 1970's, Seaman's operated as a ship chandler, i.e., a dealer in ship supplies and equipment, in the City of Eureka (City). By 1970, Seaman's business encompassed a number of activities including acting as a "general contractor" for incoming vessels, i.e., refurbishing their supplies, selling tax-free goods for offshore use, and managing a small marine fueling station as the consignee of Mobil Oil Company (Mobil).

Around this time, the City decided to condemn the decrepit waterfront area where Seaman's was located for development into a modern marina. To this end, it sought funds from the federal Economic Development Agency (EDA). Seaman's saw the redevelopment as a way to expand and modernize its operations. Accordingly, the company approached the City with a plan to lease a large portion of the new marina. Seaman's planned to use some of the area for its own operations and to profitably sublet the remainder.

In early 1971, Seaman's and the City signed an initial lease for a relatively small area, with the understanding that the lease could be renegotiated to include the larger area that Seaman's wanted. The renegotiation was conditioned on Seaman's providing evidence of financial responsibility to both the EDA and the City's bonding consultants.

A major element of Seaman's planned expansion, and the key to approval of the larger lease, was Seaman's operation of a marine fuel dealership with modernized fueling equipment. To secure such a dealership, Seaman's opened negotiations with several oil companies, but soon narrowed the field to Mobil and the defendant here, Standard Oil of California (Standard).

While negotiations with both companies were progressing, the City began pressuring Seaman's for a final decision on the marina lease. The City's bonding consultants demanded written evidence of a binding agreement with an oil supplier before they would approve leasing the larger area to Seaman's.

Upon reaching a tentative agreement with Standard, Seaman's requested evidence of that agreement—"something that would be binding on both parties"—to show to the City. In response, Standard sent a "letter of intent" setting forth the terms of negotiation. However, the letter explicitly provid-

ed that the terms were not binding. Since Seaman's needed a binding commitment, it continued to negotiate with Mobil.

Finally, Seaman's and Standard reached an agreement on all major points. Upon Seaman's repeated requests for an instrument evidencing a binding commitment, Standard, on October 11, 1972, wrote a letter setting forth the terms of the agreement. In the letter, Standard proposed (1) to sign a Chevron Marine Dealer agreement with Seaman's for an initial term of 10 years; (2) to advance Seaman's the cost of the new fueling facilities, or up to $75,000, which sum was to be amortized over the life of the agreement at the rate of one cent per gallon of oil; (3) to provide a 4.5 cent discount per gallon off the posted price of fuel; and (4) to sign an agreement providing for Standard's right to cure in case of default by Seaman's.

The letter concluded "this offer is subject to our mutual agreement on the specific wording of contracts to be drawn, endorsement and/or approval by governmental offices involved, and continued approval of Seaman's credit status at the time the agreements are to go into effect.[1] If this approach and proposal meets with your approval, *we would appreciate your acknowledgement and acceptance of these terms by signing and returning two copies of this letter.* We can then proceed further with the drafting of the final agreements . . . ." (Italics added.) The letter was signed by an agent of Standard and—under the legend, *"we accept and agree to the terms and conditions stated herein"*—by an agent of Seaman's. (Italics added.)

According to Seaman's, the signing of this letter was a momentous occasion. One of those present suggested, "Well, shouldn't we have souvenir pens here and I will exchange pens," as "when the President signs a bill into law." Standard's representative exclaimed that it was "going to be great doing business with [Seaman's]" and that the agreement was a "feather in his cap." One of the parties declared, "We finally have a contract" and "we're on our way."

Seaman's immediately presented the letter to the City and shortly thereafter signed a 40-year lease for the entire area it sought in the marina. Seaman's also ended negotiations with Mobil after informing them that a contract had been signed with Standard.

Conditions in the oil industry soon changed, however. By the end of 1972, what had been a "buyer's market" had become a "seller's market." As a

---

[1]Internal memoranda indicate that Standard contemplated using nonapproval of Seaman's credit as an excuse to justify nonperformance should the terms of the agreement later prove unfavorable.

result, in January of 1973, Standard adopted a "no new business" policy. During 1973, Standard and Seaman's signed a temporary marine dealership agreement designed to supply Seaman's with the fuel it needed while the new marina was under construction. The marine dealership agreement contemplated in the October 11, 1972, letter, however, was never signed.

In November of 1973, a federal program mandating the allocation of petroleum products among existing customers went into effect. By letter dated November 20, 1973, Standard told Seaman's that the new federal "regulations require suppliers to supply those purchasers to whom they sold during [the base period of 1972]. Our records disclose that we did not supply diesel fuel to you at any time during 1972 . . . . [¶] Under the circumstances, we will not be able to go forward with the financing we [have] been discussing. In the event the mandatory program is withdrawn and our supply situation improves, we would, of course, be pleased to again discuss supplying your needs."

In telephone calls and personal meetings with Seaman's, Standard indicated that the new federal regulations were the *only* barrier to the contract. "[I]f it wasn't for the [federal agency], . . . [Standard] would be willing to go ahead with the contract . . . ." "If [Seaman's could] get the federal government to change that order so that Standard could supply [Seaman's] with fuel [Standard] would be very happy . . . ." Standard even supplied Seaman's with the forms necessary to seek a supply authorization from the federal agency and helped fill them out.

As a result of these efforts, a supply order was issued on February 4, 1974. Standard responded by changing its position. The company contended now that no binding agreement with Seaman's had ever been reached. Therefore, Standard decided to appeal the order "[b]ecause [it] did not want to take on any new business." When Seaman's learned of the appeal, it twice wrote to Standard requesting an explanation. None was forthcoming. Standard's federal appeal was successful. Internal memoranda reveal Standard's reaction to this result: "[g]reat!!" "We are recommending to other div[isions] that they follow your example."

Seaman's then appealed and this decision was, in turn, reversed. The new decision provided that an order "direct[ing] [Standard] to fulfill supply obligations to Seaman's" would be issued upon the filing of a copy of a court decree that a valid contract existed between the parties under state law.

Seaman's asked Standard to stipulate to the existence of a contract, explaining that it could not continue in operation throughout the time that a

trial would take. In reply, Standard's representative laughed and said, "See you in court." Seaman's testified that if Standard had cooperated, Seaman's would have borrowed funds to remain in business until 1976 when the new marina opened.

Seaman's discontinued operations in early 1975. Soon thereafter, the company filed suit against Standard, charging Standard with breach of contract, fraud, breach of the implied covenant of good faith and fair dealing, and interference with Seaman's contractual relationship with the City. The case was tried before a jury which returned a verdict for Seaman's on all but the fraud cause of action. For breach of contract, the jury awarded compensatory damages of $397,050. For tortious breach of the implied covenant of good faith and fair dealing, they awarded $397,050 in compensatory damages and $11,058,810 in punitive damages. Finally, for intentional interference with an advantageous business relationship, the jury set compensatory damages at $1,588,200 and punitive damages at $11,058,810.

Standard moved for a new trial, charging, inter alia, that the damages were excessive as a matter of law. The trial court conditionally granted the motion unless Seaman's consented to a reduction of punitive damages on the interference count to $6 million and on the good faith count to $1 million. Seaman's consented to the reduction, and judgment was entered accordingly. Standard appeals from the judgment. Seaman's has filed a cross-appeal.

## II.

The first issue this court must decide is whether the October 11th letter signed by Seaman's and Standard is sufficient to satisfy the statute of frauds.

California's general statute of frauds is found at section 1624 of the Civil Code. That section provides that "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is "invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent . . . ."

It is well settled that to be enforceable under this statute, such writing must "contain the essential elements of a specific, consummated agreement." (*Franklin* v. *Hansen* (1963) 59 Cal.2d 570, 574 [30 Cal.Rptr. 530, 381 P.2d 386].) Only the essential terms must be stated, " 'details or particulars' need not [be]. What is essential depends on the agreement and its

context and also on the subsequent conduct of the parties . . . ." (Rest.2d Contracts, § 131, com. g, p. 338.)

█ Standard contends that the October 11th letter is not sufficiently precise, with respect to the essential terms of price, parties, and quantity, to pass muster. Put simply, this contention is not well taken.

The October 11th letter evidences an agreement between the parties that Seaman's would become a "Chevron," i.e., Standard, dealer. The price Seaman's agreed to pay for fuel was clearly set forth in the letter as 4.5 cents less than Standard's wholesale posted price at the time of delivery. Thus, both "parties" and "price" were established with sufficient specificity.

Moreover, although no express quantity term was set forth, none was necessary here. █ An " ' 'agreement will not be held deficient [under the statute of frauds] for the failure to express that which is clearly *implied* when the writing is interpreted in accordance with the intentions of the parties.' [Citations.]" (*Seck* v. *Foulks* (1972) 25 Cal.App.3d 556, 568 [102 Cal.Rptr. 170].) █ The October 11th letter is evidence of a dealership arrangement. The obvious implication of such an arrangement is that the wholesaler will supply as much fuel as the dealer requires. That is, the parties entered into a "requirements" contract.

Such contracts " ' ' "have been enforced by the courts with little difficulty, where the surrounding circumstances indicate the approximate scope of the promise." ' ' " (*Fisher* v. *Parsons* (1963) 213 Cal.App.2d 829, 834 [29 Cal.Rptr. 210], quoting 1 Williston on Contracts (3d ed. 1957) § 104A, p. 402.) █ Since "requirements" contracts are sufficiently precise to be enforceable, they are sufficiently precise to satisfy the statute of frauds. (See, *infra,* 2 Anderson, Uniform Commercial Code (3d ed. 1982) § 2-201:113, p. 70 [considering same issue under Uniform Commercial Code (UCC)].)

█ █ █ █ Thus, the letter contained all the "essential terms" of the contract, and is enforceable under Civil Code section 1624.[2]

---

[2]Standard also argues that the letter was insufficient under the statute of frauds because it was ambiguous as to which party had the option to renew the contract and which party would get the benefit of the 1 cent discount upon full amortization of the loan. However, it is far from clear that the parties considered these terms "essential" to their agreement. Moreover, the fact that a term in a contract is susceptible of two interpretations does not make the contract invalid under the statute of frauds. Extrinsic evidence is always admissible to resolve ambiguities on the face of a contract. (*Franklin* v. *Hansen, supra,* 59 Cal.2d at p. 574.)

■ Since this contract contemplated a sale of goods, the requirements of the statute of frauds of the UCC must also be met. (Cal. U. Com. Code, § 2201.) To be sufficient under this statute, the writing must be signed, it must indicate that a contract has been made, and it must specify a quantity term. (U.C.C. com. 1, 23A West's Cal. Ann. Com. Code (1964 ed.) p. 132.)

■ Standard argues again that the letter fails to satisfy the UCC's statute of frauds because a quantity term is not specified. However, as noted, the letter evidences a "requirements" contract. This is sufficient to satisfy the UCC's statute of frauds. ■ "[S]ince a written contract for output and requirements is binding under the [UCC], it should follow that a writing is sufficient which indicates that there has been a 'real transaction' for the sale of output or for the purchase of requirements." (2 Anderson, Uniform Commercial Code (3d ed. 1982) § 2-201:113, p. 70, fn. omitted.)

The overwhelming weight of authority supports this view. (*R. F. Weaver & Assoc., Inc.* v. *Asphalt Const. Inc.* (D.C. Cir. 1978) 587 F.2d 1315; *Riegel Fiber Corp.* v. *Anderson Gin. Co.* (5th Cir. 1975) 512 F.2d 784, 788 and fn. 7; *Rockland Industries, Inc.* v. *Frank Kasmir Assoc.* (N.D.Tex. 1979) 470 F.Supp. 1176; *R. L. Kimsey Cotton Co., Inc.* v. *Ferguson* (1975) 233 Ga. 962 [214 S.E.2d 360, 363]; *Harris* v. *Hine* (1974) 232 Ga. 183 [205 S.E.2d 847, 850]; *Fortune Furn. Mfg. Co., Inc.* v. *Mid-South Plastic Fab. Co.* (Miss. 1975) 310 So.2d 725, 728; *Kubik* v. *J & R Foods of Oregon, Inc.* (1978) 282 Ore. 179 [577 P.2d 518]; *Port City Construction Co., Inc.* v. *Henderson* (1972) 48 Ala.App. 639 [266 So.2d 896].)[3]

■ It is important to remember that "[t]he primary purpose of the Statute [of frauds] is evidentiary, to require reliable evidence of the existence and terms of the contract and *to prevent enforcement* through fraud or perjury *of contracts never in fact made* . . . . Where only an evidentiary purpose is served, the requirement of a memorandum is read in the light of the dispute which arises and the admissions of the party to be charged; there is

---

[3]The "contrary" authority cited by Standard is simply not on point. (See *Doral Hosiery Corporation* v. *Sav-A-Stop, Inc.* (E.D.Pa. 1974) 377 F.Supp. 387 [not a "requirement" or "output" contract]; *Cox Caulking, etc.* v. *Brockett Distributing Co.* (1979) 150 Ga.App. 424 [258 S.E.2d 51, 52] [same]; *Ace Concrete Prod.* v. *Chas. J. Rogers Const.* (1976) 69 Mich.App. 610 [245 N.W.2d 353, 354] [the space for the quantity term on the memorandum was left blank; the memorandum said only "concrete for tunnels"]; *Lowe's Companies, Inc.* v. *Lipe* (1973) 20 N.C.App. 106 [201 S.E.2d 81, 82] [no writing made *any* reference to quantity; plaintiff alleged only that he "agreed to furnish the Defendants with various building materials"]; *Alaska Ind. Fish Mkg. Ass'n.* v. *New England Fish Co.* (1976) 15 Wn.App. 154 [548 P.2d 348] [no written quantity term at all; no allegation of a "requirement" or "output" contract].)

no need for evidence on points not in dispute.''[4] (Rest.2d Contracts, § 131, com. c, p. 335, italics added.) ▮ Standard signed a letter which contained, by its own terms, an ''offer'' of contract. Seaman's ''accepted'' this offer—again the terms are Standard's—by signing the letter and returning one copy. The evidence leaves no doubt a contract was made. The requirements of the statute of frauds were more than adequately met here.

## III.

This court must next consider the role of ''intent'' or ''motive'' in the tort of ''intentional interference with contractual relations.'' According to Standard, its ''motive'' or ''purpose'' in interfering with Seaman's contract with the City is critical to a finding of liability. Seaman's contends, in turn, that Standard's motive is irrelevant—it is enough that Standard knew that interference with the contract was ''substantially certain'' to result from its conduct. Both parties' arguments, however, betray some confusion about the function and meaning of ''intent'' in this tort.

▮ Intentional interference with contractual relations has its roots in the tort of ''inducing breach of contract.'' Both are *intentional* torts. As this court explained in an early case, ▮ ''The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or *his actions were not intended to induce a breach, he cannot be held liable though an actual breach results* from his lawful and proper acts. (Rest., Torts, sec. 766, comment e; [citations].)'' (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 37 [112 P.2d 631], italics added; *Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 853 [82 Cal.Rptr. 830]; *Springer* v. *Singleton* (1967) 256 Cal.App.2d 184, 188 [63 Cal.Rptr. 770, 27 A.L.R.3d 1220].)

The Restatement section cited by the court explains, ''The essential thing is the *purpose to cause the result*. If the actor does not have this purpose, his conduct does not subject him to liability under this rule *even if it has the unintended effect of deterring the third person from dealing with the other*.'' (Rest., Torts, § 766, com. d, italics added.) It is not enough that the actor intended to perform the acts which caused the result—he or she must have intended to cause the result itself.

---

[4]In this regard, it is worthy of note that even Standard's agent seemed to agree that the letter contained all ''essential'' terms. When asked at trial ''the big terms are all set forth in the record, right?,'' he answered, ''the terms of negotiations are, yes.'' Standard's position at trial seemed to rely not on the fact that essential terms were missing from the letter/contract, but that a binding agreement had never been reached.

In recent years, the tort of "inducing breach of contract" has expanded to permit liability where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract "more expensive or burdensome" (*Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 232 [11 Cal.Rptr. 97, 359 P.2d 465]), or interferes with the formation of a *prospective* economic relationship (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865]). The requirement that the defendant act with culpable intent, though, has remained.

Thus, in an action for inducing breach of contract it is essential that plaintiff plead and prove that the defendant "*intended* to induce a breach thereof . . . ." (*Abrams & Fox* v. *Briney* (1974) 39 Cal.App.3d 604, 608 [114 Cal.Rptr. 328], italics added; *H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 405 [167 Cal.Rptr. 392]; *Richardson* v. *La Rancherita* (1979) 98 Cal.App.3d 73, 80 [159 Cal.Rptr. 285]; *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 78 [154 Cal.Rptr. 43]; see *Imperial Ice Co.* v. *Rossier, supra,* 18 Cal.2d at p. 39.) ▪ Similarly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove "*intentional* acts on the part of the defendant *designed* to disrupt the relationship." (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827, italics added; *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 126 [172 Cal.Rptr. 74]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18-19 [144 Cal.Rptr. 664].)

▪ Only if and when plaintiff establishes an "intent to interfere" does the issue of "justification" come into play. (*Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 18-19.) "[W]hile defendant's culpable *intent* is an element of the cause of action to be pleaded and proved by plaintiff, defendant's *justification* is an affirmative defense" in the torts of interference with an existing or prospective economic relationship. (*A. F. Arnold & Co.* v. *Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 714 [104 Cal.Rptr. 96].) It is here that defendant's *motive* for intentionally interfering becomes relevant. "Given the intention to interfere with the contract, liability usually will turn upon the ultimate purpose or object which the defendant is seeking to advance." (Prosser, Torts (4th ed. 1971) § 129, p. 942.)

▪ Seaman's is mistaken, therefore, when it asserts that Standard's "intent" to interfere with the contract is not a necessary prerequisite to

liability.[5] It is. Similarly, Standard is mistaken when it implies that an improper "motive" is an element of plaintiff's cause of action rather than a factor in defendant's affirmative defense. It is not.

 In this case, the jury was instructed that "[a] defendant is deemed to have acted intentionally if it knew that disruption or interference with an advantageous relationship was substantially certain to result from its conduct."

 Intent, of course, may be established by inference as well as by direct proof. Thus, the trial court could properly have instructed the jury that it *might* infer culpable intent from conduct "substantially certain" to interfere with the contract. Here, though, the jury was instructed that culpable intent was "deemed" to exist if Standard knew that its conduct would interfere with the contract. Under the principles outlined above, this instruction was clearly in error. (See *Gantry Constr. Co.* v. *American Pipe & Constr. Co.* (1975) 49 Cal.App.3d 186, 199 [122 Cal.Rptr. 834].)

 "[I]f it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal." (*Henderson* v. *Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].) Here, there is simply no evidence in the record that Standard acted with the purpose or design of causing Seaman's to breach its contract with City. Rather, it seems obvious, and Seaman's does not contend otherwise, that the breach was merely an incidental, if foreseeable, consequence of Standard's action. Under these circumstances, it is clear that plaintiff failed to carry its burden of proving "intent." Thus, the erroneous jury instructions were clearly prejudicial, and the judgment for Seaman's on this count must be reversed.

## IV.

The principal issue raised by this appeal is whether, and under what circumstances, a breach of the implied covenant of good faith and fair dealing in a commercial contract may give rise to an action in tort. Standard contends that a tort action for breach of the implied covenant has always been, and should continue to be, limited to cases where the underlying contract is

---

[5]Citing *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 805 [157 Cal.Rptr. 407, 598 P.2d 60], Seaman's contends that intent is no longer a necessary element of the cause of action for intentional interference with contractual relations. *J'Aire,* however, concerned *negligent* interference with prospective economic advantage. It is sufficient to note that, regardless of the possible merits of an action for negligent interference on these facts, Seaman's neither pled nor proved nor submitted to the jury any such theory of liability.

one of insurance. Seaman's, pointing to several recent cases decided by this court and the Courts of Appeal, challenges this contention. A brief review of the development of the tort is in order.

It is well settled that, in California, the law implies in *every* contract a covenant of good faith and fair dealing. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 576, p. 493; see, e.g., *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 429 [58 Cal.Rptr. 13, 426 P.2d 173] ["*in every contract,* including policies of insurance, there is an implied covenant of good faith and fair dealing . . . ." (Italics added.)]) Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement. (1 Witkin, *op. cit. supra,* at p. 493.)

California courts have recognized the existence of this covenant, and enforced it, in cases involving a wide variety of contracts. Courts have provided contract remedies for breach of the covenant in such diverse contracts as agreements to make mutual wills (*Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 564 [212 P.2d 878] [specific performance]), agreements to sell real property (*Osborne* v. *Cal-Am Financial Corp.* (1978) 80 Cal.App.3d 259, 266 [145 Cal.Rptr. 584] [rescission]), employee incentive contracts (*Foley* v. *U. S. Paving Co.* (1968) 262 Cal.App.2d 499, 505 [68 Cal.Rptr. 780] [damages]), leases (*Cordonier* v. *Central Shopping Plaza Associates* (1978) 82 Cal.App.3d 991, 1000, 1002 [147 Cal.Rptr. 558] [same]), and contracts to provide utility services (*Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 9 [135 Cal.Rptr. 170] [same]).

In the seminal cases of *Comunale* v. *Traders & General Ins. Co., supra,* 50 Cal.2d 654, and *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, this court held that a breach of the covenant of good faith and fair dealing by an insurance carrier may give rise to a cause of action in tort as well as in contract. (*Crisci, supra,* at p. 432.)

While the proposition that the law implies a covenant of good faith and fair dealing in all contracts is well established, the proposition advanced by Seaman's—that breach of the covenant always gives rise to an action in tort—is not so clear. In holding that a tort action is available for breach of the covenant in an insurance contract, we have emphasized the "special relationship" between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility. (*Egan* v. *Mutual of*

*Omaha Ins. Co., supra,* 24 Cal.3d at p. 820.) No doubt there are other relationships with similar characteristics and deserving of similar legal treatment.[6]

When we move from such special relationships to consideration of the tort remedy in the context of the ordinary commercial contract, we move into largely uncharted and potentially dangerous waters. Here, parties of roughly equal bargaining power are free to shape the contours of their agreement and to include provisions for attorney fees and liquidated damages in the event of breach. They may not be permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured.[7] In such contracts, it may be difficult to distinguish between breach of the covenant and breach of contract, and there is the risk that interjecting tort remedies will intrude upon the expectations of the parties. This is not to say that tort remedies have no place in such a commercial context, but that it is wise to proceed with caution in determining their scope and application.

For the purposes of this case it is unnecessary to decide the broad question which Seaman's poses. Indeed, it is not even necessary to predicate liability on a breach of the implied covenant. ██ It is sufficient to recognize that a party to a contract may incur tort remedies when, in addition to breaching the contract, it seeks to shield itself from liability by denying, in bad faith and without probable cause, that the contract exists.

It has been held that a party to a contract may be subject to tort liability, including punitive damages, if he coerces the other party to pay more than is due under the contract terms through the threat of a lawsuit, made " 'without probable cause and with no belief in the existence of the cause of action.' " (*Adams* v. *Crater Well Drilling, Inc.* (1976) 276 Ore. 789 [556 P.2d 679, 681].) There is little difference, in principle, between a contracting party obtaining excess payment in such manner, and a contracting party seeking to avoid all liability on a meritorious contract claim by adopting a

---

[6]In *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 179, footnote 12 [164 Cal.Rptr. 839, 610 P.2d 1330], this court intimated that breach of the covenant of good faith and fair dealing in the employment relationship might give rise to tort remedies. That relationship has some of the same characteristics as the relationship between insurer and insured. (See Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1981) 16 U.S.F. L.Rev. 187, 220-226.)

[7]California's Commercial Code section 1102 prohibits disclaimer of the good faith obligation, as well as the obligations of diligence, reasonableness, and care, but provides that "the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

"stonewall" position ("see you in court") without probable cause and with no belief in the existence of a defense. Such conduct goes beyond the mere breach of contract. It offends accepted notions of business ethics. (See *Jones* v. *Abriani* (1976) 169 Ind. 556 [350 N.E.2d 635].) Acceptance of tort remedies in such a situation is not likely to intrude upon the bargaining relationship or upset reasonable expections of the contracting parties.

■ Turning to the facts of this case, the jury was instructed that "where a binding contract [has] been agreed upon, the law implies a covenant that neither party will deny the existence of a contract, since doing so violates the legal prohibition against doing anything to prevent realization of the promises of the performance of the contract."

According to Standard, this instruction erroneously allowed the jury to hold Standard liable if it found that Standard denied the existence of a valid contract, regardless of whether that denial was in good or bad faith.

■ Of course, "it is not a tort for a contractual obligor to dispute his liability under [a] contract" (*Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]) if the dispute is honest and undertaken in good faith. (See *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) Similarly, it is not a tort for one party to deny, in good faith, the existence of a binding contract.

■ Since Standard's denial of the existence of a binding contract would not have been tortious if made in good faith, the trial court erred in failing to so instruct the jury. It is then necessary to decide whether this error requires that the judgment be reversed.

Article VI, section 13 of the California Constitution provides that error in instructing the jury shall be grounds for reversal only when the reviewing court, "after an examination of the entire cause, including the evidence," concludes that the error has resulted in a "miscarriage of justice." In interpreting the phrase "miscarriage of justice" as used in section 13, this court has formulated the following general test. ■ "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The test is "necessarily [] based upon reasonable probabilities rather than upon mere possibilities; otherwise the entire purpose of the constitutional provision would be defeated." (*Id.*, at p. 837.)

The test of reversible error has also been stated in terms of the likelihood that the improper instruction misled the jury. (See *Henderson* v. *Harnischfeger Corp.*, *supra*, 12 Cal.3d at p. 670; *Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652, 660-661 [320 P.2d 500, 65 A.L.R.2d 1].) ▆▆ While there is no precise formula for measuring the prejudicial effect of an erroneous instruction, the following factors may be considered: "(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

▆▆ In this case, there is a considerable degree of conflict in the evidence on the issue of whether Standard denied the existence of a contract in bad faith. On the one hand, the record contains evidence from which the jury could have inferred that Standard acted in bad faith and without a reasonable belief in its position when it denied the existence of a binding contract. The timing of the denials and the circumstances in which they were made would support the conclusion that Standard was cynically attempting to avoid *both* performance *and* liability for nonperformance of contractual obligations which it privately recognized to be binding.

On the other hand, Standard offered conflicting evidence from which the jury could have concluded that it acted in good faith. Standard argued strenuously that it never viewed the October 11, 1972, document as a binding contract since it believed that the document did not contain essential elements and, therefore, failed to satisfy the statute of frauds. Hence, application of the first of the five factors identified in *LeMons* supports a finding of prejudice.

The second *LeMons* factor concerns the effect of Seaman's arguments to the jury. In his closing argument, counsel for Seaman's made at least two statements which may have contributed to the misleading effect of the instruction. First, he told the jury that it should award punitive damages to teach Standard that "[y]ou can't threaten people with endless and expensive litigation. That's an unjust hardship." The jury was not told that if Standard believed in good faith that no contract existed, Standard had a right to refuse to stipulate to the existence of a contract and to force Seaman's to litigate its claim. Second, in his rebuttal, Seaman's attorney acknowledged that Standard had the right to appeal the February supply order. However, he

added that if Standard appealed *"erroneously,* vexatiously to harass—and doesn't anybody think that that was the motive with regard to Seaman's— then they pay the piper. It is not sufficient to say that they had the right." (Italics added.)[8]

These arguments reinforced the misleading effect of the instruction. Both statements suggested that Standard could be held liable for denying the existence of the contract if the denials were subsequently shown to be erroneous, without any requirement for a finding of bad faith.

Seaman's arguments also included other statements aimed at persuading the jury that the denials were in fact made in bad faith. Both in his opening statement and in his closing argument, counsel for Seaman's stressed certain evidence which he claimed established that Standard had believed prior to its denials that a binding contract existed.

The evidence in question was the deposition testimony of Ernest Bodnar, an independent financial consultant. Bodnar's firm was hired by the City of Eureka to evaluate Seaman's financial solvency and ability to pay the rent under the proposed port facility lease. In the course of the evaluation, Bodnar became convinced that Seaman's acceptability as a tenant turned on whether the October 11, 1972, letter constituted a firm commitment by Standard to supply Seaman's with fuel on the terms set forth in the letter.

Bodnar testified that he telephoned Mr. MacDonald, a Standard official, to verify this fact. After speaking with MacDonald, it was his understanding that Standard intended to comply with the terms of the letter. Bodnar also testified that he had relied on the conversation in preparing a favorable report to the city on the prospect of a Seaman's tenancy.

In his closing argument, Seaman's attorney returned to this testimony to argue that Standard knew before its denials that it had a binding contract with Seaman's.[9]

---

[8]The latter statements were made in the course of argument regarding the cause of action for intentional interference with contractual relations. However, the suggestion that Standard could be held liable if the basis of its administrative appeal—the lack of a binding contract— turned out to be merely erroneous applied with equal force to the cause of action for breach of the implied covenant of good faith and fair dealing.

[9]At one point in his argument, Seaman's attorney suggested that Standard failed to produce MacDonald at trial because it recognized that his affirmance and subsequent denial of the existence of the contract with Seaman's was unexplainable and extremely damaging to Standard. The jury was told that "Mr. Bodnar says, . . . 'I called MacDonald and verified with him that Standard had a deal.' Any denial of that? This is the same MacDonald who three or four months or a year later is saying to [Seaman's], 'We never had a deal . . . . We'll fight you to the highest court in the land.' It's the same MacDonald. Why didn't you see

The Bodnar testimony might have persuaded the jury that Standard's denials were in fact made in bad faith. However, Seaman's arguments regarding the effect of that testimony did not inform the jury that before liability could be imposed, a finding of bad faith was required. Thus, they did not serve to counteract the tendency of other statements made by Seaman's attorney to reinforce the misleading effect of the erroneous instruction.

The third factor considered in measuring prejudice is whether the jury requested a rereading of the erroneous instruction or of related evidence. Here, the jury requested that the written instructions on all of the causes of action be left with them during their deliberations. The instructions on the cause of action for breach of the implied covenant of good faith and fair dealing were not singled out. Furthermore, it is not clear from the record whether the request included the erroneous instruction on the specific duty not to deny the existence of a binding contract. As a result, the jury's request for the instructions is of little assistance in the determination of prejudice.

However the jury also made a request—which it later withdrew—for a rereading of the Bodnar testimony. As previously noted, that testimony was closely related to the subject matter of the erroneous instruction.

For purposes of determining the instruction's prejudicial effect, the retraction of the request is even more significant than the request itself. The record reflects the following colloquy between the court and the jury foreman: "THE COURT: [Y]ou asked to have the testimony of Mr. Bodnar reread, or certain portions about his state of mind and about an alleged phone call made to Mr. MacDonald. The daily transcripts have been typed up, and the court reporter will read to you that portion of the testimony. [¶] JURY FOREMAN FLOHAUG: Your Honor, at this point I don't think we need that portion that we requested. [¶] We had talked about it prior, but I don't think it is any longer necessary to our train of thought on it."

The request for a rereading of the Bodnar testimony suggests that the jury initially tried to decide whether Standard acted in bad faith when it subsequently denied the existence of a binding contract.[10] However, the fore-

---

that Mr. MacDonald? I would like to have seen him in this courtroom."

In his rebuttal, counsel for Seaman's again stressed the Bodnar testimony, telling the jury that "Bodnar called MacDonald and MacDonald says, 'Yes. We have a deal. We've got a firm deal . . . .'"

[10]The request might also have been directed solely to the threshold question of whether a binding contract had been formed. The jury had to resolve that question in order to reach a verdict, not only on the cause of action for breach of the implied covenant of good faith and fair dealing, but also on the cause of action for breach of contract. However, at the same time that it requested the Bodnar testimony, the jury made another request which establishes

man's retraction of the request, together with his explanation that Bodnar's testimony about the discussion with MacDonald was no longer "necessary to [the jury's] train of thought," indicate that the jury concluded that no finding of bad faith was required. Thus, the retraction of the request supports Standard's contention that the effect of the erroneous instruction was prejudicial.

Only nine of the twelve jurors concurred in the verdict for Seaman's on the cause of action for breach of the implied covenant of good faith and fair dealing. Here, as in *Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929], "[t]he fact that only the bare number of jurors required to reach a verdict agreed upon the verdict for [plaintiff] lends further support to the probability that the erroneous instruction was the factor which tipped the scales in [plaintiff's] favor." (Accord *LeMons* v. *Regents of University of California, supra,* 21 Cal.3d at p. 877.)

Finally, none of the other instructions remedied the error. Thus, each of the five factors which have been considered in measuring the effect of an erroneous instruction points to the same conclusion.

██ "Where it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict.'" (*Robinson* v. *Cable, supra,* 55 Cal.2d at p. 428; *Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d at p. 670.) ██ Here, it seems probable that the jury may have imposed liability on Standard as a result of the trial court's failure to instruct as to the bad faith requirement. Accordingly, the judgment in favor of Seaman's for breach of the duty of good faith and fair dealing must be reversed.

## V.

The judgment in favor of Seaman's for breach of contract is affirmed. The judgment for intentional interference with contractual relations and for breach of the duty of good faith and fair dealing is reversed[11] with directions to conduct further proceedings consistent with this opinion.

**BIRD, C. J.**—I concur in sections I, II and III of the court's opinion. However, I dissent in part from section IV. A contracting party should not

that it had already reached a firm decision on the existence of a binding contract. That request read: " 'We took a vote to determine whether or not the 10-11-72 letter was a contract. Do we have to record this anywhere?' "

[11]Reversal of the judgment for Seaman's on the actions for intentional interference and breach of the implied covenant of good faith and fair dealing makes consideration of Seaman's cross-appeal from the remittitur of punitive damages unnecessary.

be able to deny the existence of a valid contract in order to shield itself from liability for breach of that contract. Today, the court holds that an action will lie in tort against such conduct. However, it refuses to acknowledge that its holding is compelled by this court's past decisions analyzing the scope of the implied covenant of good faith and fair dealing. This court should not continue to retreat from its own decisional authority in this area.

I also write separately because I believe that this court should forthrightly recognize the principle that, under certain circumstances, a breach of contract may support a tort cause of action for breach of implied covenant.

### I.

Over 25 years ago, this court held that a breach of the implied covenant of good faith and fair dealing may give rise to a tort cause of action. (Majority opn., *ante*, at p. 768; *Comunale* v. *Traders General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 432 [58 Cal.Rptr. 13, 426 P.2d 173].) Since that time, a substantial body of law has developed defining the scope of that duty with criteria for the award and measurement of compensatory and punitive tort damages. (See, e.g., *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141]; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470].)

California has not been alone in recognizing that a breach of the implied covenant may give rise to a cause of action in tort. The courts of many other states have allowed a tort recovery for the breach of this covenant. (See Kornblum, *Recent Cases Interpreting the Implied Covenant of Good Faith and Fair Dealing* (1981) 30 Def.L.J. 411, 431-432, fn. 50 [collecting cases].)

This development has taken place primarily in the context of insurance contracts. However, this court has never expressly or impliedly limited the tort action to insurance cases.

Moreover, California courts have expressly recognized the availability of a tort recovery for breach of the covenant in other contexts. (See generally, Louderback & Jurika, *Standards for Limiting the Tort of Bad Faith Breach of Contract* (1982) 16 U.S.F. L.Rev. 187.) For example, in *Tameny* v.

*Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330], the late Justice Mathew O. Tobriner writing for a near unanimous court acknowledged the possibility that a tort action for the breach of the implied covenant was applicable in the area of employment contracts.

The *Tameny* court noted that "past California cases have held that a breach of this implied-at-law covenant *sounds in tort as well as in contract.*" (*Id.,* at p. 179, fn. 12, italics added.) Following the *Tameny* cue, two recent cases in the Court of Appeal have recognized that a tort cause of action for the breach of the duty of good faith and fair dealing will lie outside the insurance context. (See, e.g., *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 455 [164 Cal.Rptr. 839, 610 P.2d 1330]; *Wagner* v. *Benson* (1980) 101 Cal.App.3d 27, 33 [161 Cal.Rptr. 516]; cf. *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 135, fn. 8 [135 Cal.Rptr. 802].) This case raises this issue and it should be resolved.

When determining what conduct constitutes a tortious breach of the duty of good faith and fair dealing, courts first consider the parties' "reasonable expectations" concerning the nature of their agreement and their rights and responsibilities thereunder. (*Jarchow* v. *Transamerica Title Ins. Co., supra,* 48 Cal.App.3d at p. 941.) " 'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .' " (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 922, fn. 5.) Once those "justified expectations" are established, "good faith" requires the parties to act "reasonably" in light of those expectations.

Past cases which have recognized a tort cause of action for breach of the covenant emphasize "reasonableness." In *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 819, for example, the court first examined both the motivation and expectations of the insured in obtaining a policy of insurance. In light of those expectations, the court held that the implied covenant imposed a duty on the insurer to thoroughly investigate the foundation of an insured's claim before it could "*reasonably* and in *good faith* deny payments to its insured . . . ." (*Ibid.,* italics added.) Breach of that duty was a tort. (*Ibid.*)

Similarly, in *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at page 429, the court noted that "one of the usual methods by which an insured receives protection under a liability insurance policy is by settlement of claims without litigation . . . ." Therefore, an insurer breaches the duty of good faith and fair dealing, the court concluded, when it "*unwarrantedly* refuses an

offered settlement where the most *reasonable* manner of disposing of the claim is by accepting the settlement." (*Id.*, at p. 430, italics added.) And, in *Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d at page 573, the duty to act fairly and in good faith was held to include "a duty not to withhold *unreasonably* payments due under a policy." (Italics added; see also *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 920; *Silberg* v. *California Life Ins. Co., supra,* 11 Cal.3d at pp. 460-461 [tort liability where "the insurer *unreasonably* and in bad faith withholds payment of the claim of the insured," italics added].) The standard of good faith conduct that emerges from these decisions is that both contracting parties must act reasonably in light of the justified expectations of the other. (See generally the discussion in *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1, 27-32 [148 Cal.Rptr. 623].)

The precise nature and extent of the duty imposed by the implied promise of good faith and fair dealing in any *particular* contract, therefore, depends upon the expectations of the parties and the purposes of the contract. (*Egan* v. *Mutual of Omaha, supra,* 24 Cal.3d at p. 818; *Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d at p. 27.) While the extent of the duty varies from contract to contract, the duty itself inheres in *every* contract.

Insurance contracts have several characteristics not shared by ordinary commercial contracts entered into by corporations. For example, consumers purchase such contracts not to obtain a commercial advantage, but to protect themselves against calamity. (See *Egan* v. *Mutual of Omaha, supra,* 24 Cal.3d at p. 819.) Thus, insurance contracts may create a "special relationship" between insurer and insured. (*Id.,* at p. 820.) These characteristics undoubtedly help shape the justified expectations of the contracting parties, and, therefore, help determine the nature and extent of the duty of good faith between them. (See *id.,* at p. 819.)

In commercial contracts which lack those characteristics, the expectations and purposes of the parties necessarily differ from those of insurer and insured. Thus, the requirements of good faith in a commercial contract are different than the requirements imposed on an insurer. While those requirements are probably less stringent in a commercial context, *they definitely exist.*

Certain expectations derive from assumptions so basic to the very notion of a contract that they are shared by virtually all contracting parties. Foremost among these is the expectation that a breaching party will compensate the other party for losses caused by the breaching party's failure to perform. The availability of contract damages, in turn, supports the equally funda-

mental assumption that breach is a foreseeable and, in most situations, acceptable possibility.

Indeed, the assumption that parties may breach at will, risking only contract damages, is one of the cornerstones of contract law. "[I]t is not the policy of the law to compel adherence to contracts, but only to require each party to choose between performing in accordance with the contract and compensating the other party for injury resulting from a failure to perform. This view contains an important economic insight. In many cases it is uneconomical to induce the completion of the contract after it has been breached." (Posner, Economic Analysis of Law (1972) p. 55.) In most commercial contracts, recognition of this economic reality leads the parties to accept the possibility of breach, particularly since their right to recover contract damages provides adequate protection.

For example, one party to a contract may decide to breach if it concludes that the market will bring a higher price for its product than that set forth in the contract. In commercial contracts, the risk of such a breach is widely recognized and generally accepted. "[I]ntentional, willful, selfishly induced breach[es] of contract [are] often an anticipated, expected and encouraged reality of commercial life." (Diamond, *The Tort of Bad Faith Breach of Contract: When, If At All, Should It Be Extended Beyond Insurance Transactions?* (1981) 64 Marq.L.Rev. 425, 438.)[1]

When the breaching party acts in bad faith to shield itself entirely from liability for contract damages, however, the duty of good faith and fair dealing is violated. (See Diamond, *The Tort of Bad Faith Breach of Contract: When, If At All, Should It Be Extended Beyond Insurance Transactions?, supra,* 64 Marq.L.Rev. at p. 447; see also Keeton, *Liability Insurance and Responsibility for Settlement* (1954) 67 Harv.L.Rev. 1136, 1139, fn. 6 [bad faith is frequently defined as "the intentional disregard of the financial interests of the (other contracting party) in the hope of escaping . . . full responsibility . . ."].)

This type of conduct violates the nonbreaching party's justified expectation that it will be able to recover damages for its losses in the event of a

---

[1]As one commentator put it, "Every morning the businessmen of America learn to their chagrin that their suppliers will not be delivering what they want when they want it. The goods will not arrive on time, they will be short count, and the only ones in stock are avocado green. If that were not bad enough, the same businessmen discover daily that their customers will not take and pay for what the businessmen think they ordered." (Rosett, *Contract Performance: Promises, Conditions and the Obligation to Communicate* (1975) 22 UCLA L.Rev. 1083.)

breach. That expectation must be protected. Otherwise, the acceptance of the possibility of breach by the contracting parties and by society as a whole may be seriously undermined.

There is no danger that permitting tort recovery for bad faith denial of the existence of a valid commercial contract will make every breach of contract a tort. First, the vast majority of contract breaches in the commercial context do *not* involve this type of bad faith conduct.

Second, " ' "it [is] well established in this state that if the cause of action arises from a breach of a promise set forth in the contract, the action is ex contractu, *but if it arises from a breach of duty growing out of the contract it is ex delicto.* " ' (Italics added.) [Citations.]" (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d at p. 175.) Thus, tort "[l]iability is imposed *not* for a bad faith breach of the contract, but for failure to meet the duty . . . included within the implied covenant of good faith and fair dealing." (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 430, italics added.) There are many situations in which a defendant's actions may sound both in tort and contract.[2] The fact that overlapping remedies may exist in some situations does not make every breach of contract a tort.

Similarly, an attempt to avoid any liability for contract damages may involve a discrete course of conduct or it may be indistinguishable from the breach of contract itself. "Breach of the covenant provides the injured party with a tort action for 'bad faith,' notwithstanding that the acts complained of may also constitute a breach of contract. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d 425, 430; *Fletcher* v. *Western National Life Ins. Co.* [(1970)] 10 Cal.App.3d 376, 401 [89 Cal.Rptr. 78.)" (*Jarchow* v. *Transamerica Title Ins. Co., supra,* 48 Cal.App.3d at p. 940.)[3]

It is a well-established principle of law that the parties' reasonable expectations should govern the determination of what conduct constitutes a tortious breach of the implied covenant of good faith and fair dealing. (See *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d at p. 818; *Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d at pp. 27-32.) Application of that principle is fully warranted here. The duty of good faith and fair dealing

---

[2]In which case, the plaintiff is free to elect the remedy. (*Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 432.)

[3]*Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623], contains the following language suggesting that bad faith conduct in addition to the breach of contract is required for tort recovery: "[T]he tort of breaching an implied covenant of good faith and fair dealing consists in bad faith action, *extraneous to the contract,* with the motive intentionally to frustrate the obligee's enjoyment of contract rights." (Italics added.) To the extent that *Sawyer* states such a requirement, it should be disapproved.

was violated because a party attempted to avoid all liability for a contract breach by denying, in bad faith, the very existence of the contract. Such conduct violates the nearly universal expectation that the injured party will be compensated for losses caused by the breaching party's failure to perform. This tort remedy was recognized by this court in its earlier decisions involving the implied covenant of good faith and fair dealing. Those decisions should be the basis for the holding here.

## II.

A breach of contract may also constitute a tortious breach of the covenant of good faith and fair dealing in a situation where the possibility that the contract will be breached is not accepted or reasonably expected by the parties.

This could happen, for example, if at the time of contracting, the parties expressly indicate their understanding that a breach would be impermissible. Or, it could happen if it were clear from the inception of the contract that contract damages would be unavailable or would be inadequate compensation for a breach. Under these circumstances, a breach of the contract could well constitute a tortious breach of the duty of good faith and fair dealing.

Insurance and employment contracts are good examples of the latter situation. Both the insurer and the insured know that, once an injury has occurred, the insured or the insured's beneficiary will suffer great hardship if benefits are not paid promptly. Thus, a breach of contract by the insurer will almost certainly cause a type of harm for which contract damages would be inadequate. Insureds, therefore, are justified in expecting that their insurance contract will *not* be breached. Similarly, breach of an employment contract by the employer can, in some situations, cause severe harm to an employee's reputation and ability to find new employment. The harm caused cannot be undone by an award of back pay. Thus, employees may be entitled to expect that their contracts will not be breached for frivolous or improper reasons.

These are just a few examples. If a plaintiff can show that, under the circumstances or characteristics of his contract, he was justified in expecting that the other party would not breach, then a voluntary breach by that party could well constitute a violation of the duty to deal fairly and in good faith.

On this record, there is ample evidence to support the conclusion that the parties' reasonable expectations did not include the possibility of breach. Standard was repeatedly informed that Seaman's needed a "binding com-

mitment." Throughout the negotiations, there was an emphasis on the need for such a commitment and for a stable relationship between Seaman's and its supplier. Standard knew that Seaman's lease, and, to some extent, the entire marina development depended on these factors. Under these circumstances, it would be reasonable to conclude that the parties' justified expectations did not include the possibility of breach.

Under this cause of action, no independent showing of bad faith should be required. Where the possibility of breach was not reasonably expected at the inception of the contract, the voluntary breach of an acknowledged contract is in itself a violation of the duty to deal fairly and in good faith.

Standard's breach did not take the form of a refusal to perform under the terms of an acknowledged contract. Instead, Standard denied the existence of the contract to the federal agency and subsequently refused to stipulate to its existence. This action was tantamount to a denial. Those denials constituted anticipatory breaches of the contract. (*Taylor* v. *Johnston* (1975) 15 Cal.3d 130, 137 [123 Cal.Rptr. 641, 539 P.2d 425].)

In this setting, the simple fact that a breach occurred will not support tort recovery without a showing of bad faith. Just as a denial of the existence of a binding contract provides the basis for tort liability only upon a finding of bad faith (majority opn., *ante,* at pp. 769-770), a contract breach predicated upon such a denial will support tort recovery on the theory of unexpected and unacceptable breach only if the denial is found to have been made in bad faith. (See *Sawyer* v. *Bank of America, supra,* 83 Cal.App.3d at p. 139; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d 376.)

### III.

The trial court failed to include a bad faith requirement in its instruction on the duty to refrain from denying the existence of a binding contract. This failure constituted error. Recovery will lie in tort if the denial was made in bad faith.

The undisputed evidence at trial showed that Standard did not deny that a contract existed until *after* it was ordered by the federal government to supply fuel to Seaman's. Until that time, Standard continually assured Seaman's that, but for the federal regulations, the contract would be honored. Standard fostered this idea by helping Seaman's to obtain and complete the forms necessary to secure relief from the federal regulations.

These actions on the part of Standard constitute strong evidence that it recognized that a binding contract existed. Standard also knew that an open

repudiation of its obligation to perform would constitute a breach of contract for which it would be liable in damages. It would appear that Standard believed that a decision not to repudiate the contract and to rely on the regulations to justify nonperformance would effectively shield it from *all* liability.[4] Clearly, using the federal regulations as a shield, Standard hoped to avoid *both* performance *and* liability for nonperformance of the contract, whose existence it could not deny.

An examination of the relationship between the defense of supervening legal impossibility and the duty of good faith and fair dealing is instructive. A contractual duty is discharged, and performance is excused, when performance is rendered impossible by a change in statute, ordinance, or administrative regulation after the contract is formed. (See Civ. Code, § 1511, subd. 1; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 607, p. 517.) However, the covenant of good faith and fair dealing imposes certain duties on a contracting party if that party seeks to justify its nonperformance on this basis.

First, the party's obligation to perform will be excused only if it has diligently attempted to contest the application of the new law. (*McNally* v. *Moser* (1956) 210 Md. 127 [122 A.2d 555, 561, 60 A.L.R.2d 388] [duty to seek zoning variance, special permit, or nonconforming use status]; *Pennsylvania State Shopping Plazas, Inc.* v. *Olive* (1961) 202 Va. 862 [120 S.E.2d 372, 375-376, 88 A.L.R.2d 1016] [duty to seek zoning variance].) "One may not rely on illegality or invalidity where the doing of that [which is] said to be forbidden may reasonably be made legal and possible through administrative or judicial action." (*McNally* v. *Moser, supra,* 122 A.2d at p. 561.) "[A] party who seeks to justify his non-performance [as impracticable due to the operation of a governmental regulation or order] must have observed the duty of good faith and fair dealing . . . in attempting, where appropriate, to avoid its application." (Rest.2d Contracts, § 264, com. b; see also *id.,* § 264, com. a, illus. 4.)

Further, the duty of good faith and fair dealing imposes an obligation on a contracting party to refrain from initiating or facilitating the enforcement of an order or regulation that would render performance illegal. (See *Webster* v. *Southern Cal. First Nat. Bank* (1977) 68 Cal.App.3d 407, 416 [137

---

[4]Subdivision (c) of section 755 of 15 United States Code provides that "[t]here shall be available as a defense to any action brought for breach of contract in any Federal or State court arising out of delay or failure to provide, sell, or offer for sale or exchange crude oil, residual fuel oil, or any refined petroleum product, that such delay or failure was caused solely by compliance with the provisions of this chapter or with the regulation of any other order under this chapter."

Cal.Rptr. 293]; *National Pave. Corp.* v. *Hutchinson Co.* (1933) 132 Cal.App. 235 [22 P.2d 534]; cf. *McNally* v. *Moser, supra,* 122 A.2d at pp. 560-561; *Colwell Co.* v. *Hubert* (1967) 248 Cal.App.2d 567, 575 [56 Cal.Rptr. 753].) This negative duty is a corollary to the affirmative duty to seek an exemption from the application of such a law where the circumstances permit it.

In this case, federal fuel allocation regulations were promulgated after the contract between the parties had been formed. The regulations appeared to prohibit Standard from performing its contractual duty to supply fuel to Seaman's. Standard responded initially by assuring Seaman's that it would be willing to go ahead with the contract if the federal government could be persuaded to change the supply order. Standard provided Seaman's with the forms necessary to secure relief from the regulations and helped Seaman's fill them out.

By assisting Seaman's in this way, Standard complied with its duty to take whatever reasonable steps were necessary to make the performance of its contractual obligations legal. The joint effort of the parties was successful and resulted in the issuance by the federal agency of a supply order that authorized Standard to supply fuel to Seaman's.

In response, Standard abruptly reversed its position. It did not reaffirm its previously expressed willingness to go forward with the contract if the barrier posed by the regulations could be removed. Instead, Standard appealed the supply order it had helped Seaman's to obtain. By appealing the order, Standard breached its duty to refrain from actively seeking the application of regulations that would excuse performance of its contractual obligations. (*Webster* v. *Southern Cal. First Nat. Bank, supra,* 68 Cal.App.3d at p. 416.)

Standard's appeal was successful, and the order authorizing it to supply Seaman's was rescinded. Standard was delighted, apparently believing that the decision shielded it from any contractual liability to Seaman's. As the preceeding discussion of the applicable legal principles demonstrates, however, Standard's contractual duties would not have been discharged if the chain of appeals and reversals regarding the supply order had ended there.

The decision rescinding the supply order was the direct result of Standard's appeal. By taking the appeal, Standard breached its duty to refrain from actions that would make its performance legally impossible. Accordingly, the renewed application of the regulations to prohibit Standard from supplying Seaman's with fuel would not have discharged Standard's con-

tractual duty. Seaman's would have been entitled to recover contract damages resulting from Standard's breach of that duty, even though Standard's only alternative to breach at that point would have required it to violate the federal regulations.

The chain of appeals and reversals did not stop with the decision rescinding the supply order, however. Seaman's appealed again, this time relying on the existence of its supply contract with Standard as the basis for an exception to the regulations. Standard opposed the granting of an exception. For the first time in its dealings with the federal agency regarding the supply order, Standard now contended that no contract existed between the parties.

Despite the objections raised by Standard, Seaman's obtained a favorable decision. Under the terms of the decision, Standard would be ordered to fulfill its supply obligations to Seaman's, provided that the federal agency received a copy of a court decree establishing the existence of a valid contract between the parties. Seaman's asked Standard to stipulate as to the existence of a contract. Standard refused.

Standard's denial of the existence of the contract to the federal agency and the subsequent refusal to stipulate were anticipatory breaches of the contract. (*Taylor* v. *Johnston, supra,* 15 Cal.3d at p. 137.) Neither the breach nor the underlying resistance to an assertion of contract liability is a tort if undertaken in good faith. (See *Sawyer* v. *Bank of America, supra,* 83 Cal.App.3d at p. 139; *Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at p. 395.) In this case, however, Standard did not deny that a contract existed until it had been ordered by the federal government to supply fuel to Seaman's. Moreover, Standard did not make its denials forthrightly as a defense to an action for breach of contract. It used them as a trump card in its final attempt to avoid all liability for nonperformance. The timing and the intended effect of both denials tend strongly to establish that they were made in bad faith.

I would affirm the judgment for Seaman's for breach of contract and breach of the duty of good faith and fair dealing.

The petition of plaintiff and appellant for a rehearing was denied November 15, 1984. Bird, C. J., was of the opinion that the petition should be granted.